1

2

3

4

5

6

7  UNITED STATES DISTRICT COURT

8  FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10  FRANCISCO SIERRA,

11        Plaintiff,

12    v.

13  T. THOMPSON, et al.,

14        Defendants.

No.  1:17-cv-01691-DAD-EPG (PC)

FINDINGS AND RECOMMENDATIONS,
RECOMMENDING THAT DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT BE
GRANTED, IN PART, AND DENIED, IN
PART

(ECF No. 58)

ORDER DENYING MOTION TO FORWARD
LETTER

(ECF NO. 66)

OBJECTIONS, IF ANY, DUE WITHIN
TWENTY-ONE DAYS

## I.   INTRODUCTION

22

23        Plaintiff Francisco Sierra is a state prisoner proceeding *pro se* and *in forma pauperis* in

24  this civil rights action filed pursuant to 42 U.S.C. § 1983. This case proceeds on Plaintiff's

25  surviving claims from his first amended complaint alleging that Defendant T. Thompson

26  retaliated against him in violation of the First Amendment and that Defendant J. Castellanos

27  subjected him to cruel and unusual punishment in violation of the Eighth Amendment. (*See* ECF

28  Nos. 16, 19).

1

On April 5, 2021, Defendants filed a motion for summary judgment, arguing that the undisputed evidence showed that they did not violate Plaintiff's constitutional rights and that they are also entitled to qualified immunity. (ECF No. 58). Plaintiff filed his opposition on July 1, 2021, and Defendants filed their reply on July 8, 2021. (ECF Nos. 66, 67).

For the reasons given below, the Court recommends granting, in part, and denying, in part, Defendants' motion for summary judgment.

Additionally, the Court denies Plaintiff's motion to forward a letter. (ECF No. 66).

## II.   BACKGROUND

### A.   The First Amended Complaint

In relevant part, Plaintiff's first amended complaint alleges that, around June 2016, Plaintiff filed a grievance related to his inmate mail while incarcerated at High Desert State Prison (HDSP).[1] (ECF No. 16, p. 5). Captain (Cpt.) Thompson spoke to Plaintiff a couple times about the matter and was very upset that the grievance was never withdrawn. (*Id.*). On November 2, 2016, "Plaintiff attended his annual review and requested a transfer."[2] (*Id.*). Plaintiff had not incurred any rules violation reports (RVR) and had attended programming and self-help groups. (*Id.*). Cpt. Thompson interrupted Plaintiff's request for a transfer. Cpt. Thompson loudly stated that Plaintiff was going nowhere and that when Plaintiff drops to a lower level he will be going to "A yard." (*Id.*). Plaintiff filed a grievance concerning Cpt. Thompson's conduct and states that "the harassment had begun." (*Id.*).

On September 26, 2017, Plaintiff was transferred to California Substance Abuse Treatment Facility and State Prison, Corcoran (CSATF). (*Id.* at 12). While at CSATF, Plaintiff spoke to C/O Castellanos about moving to Castellanos' building. (*Id.* at 13). Plaintiff was moved to the building. (*Id.*). Plaintiff then spoke to C/O Castellanos about not wanting any trouble. (*Id.*). "The conversation about [Plaintiff's] litigation steps did . . . arise." (*Id.*). Castellanos "seemed irritated and even at one point stated that retaliation was 'part of the game' when a prisoner [is]

---

[1] Plaintiff's first amended complaint included a host of other allegations against twenty-three total defendants. The Court summarizes the allegations relating only to the pending claims.

[2]   Minor alterations, such as omitting capitalization and correcting misspellings, have been made to some of Plaintiff's quotations without indicating each specific change.

trying to litigate." (*Id.*). In the following days, Plaintiff saw Castellanos pulling an inmate, Calderon, who is a "25er," into Castellano's office "at one point, late at night." (*Id.*). On October 12, 2017, as Plaintiff was walking to his housing, someone called to him and Plaintiff went to speak with them. A couple minutes later, two "25ers," inmate Calderon and an unknown inmate, jumped Plaintiff. (*Id.*). "After it stopped," Plaintiff said, "that's crazy you guys do shit for the cops." (*Id.*). "Calderon then looked at C/O Castellanos and said, 'you know what's up Castellanos.'" (*Id.*). Plaintiff received five stitches on his head.

### B.    Screening Order

Following screening, the District Judge ordered the action to proceed on Plaintiff's claims against Defendant Thompson for retaliation in violation of the First Amendment and against Defendant Castellanos for cruel and unusual punishment in violation of the Eighth Amendment. (ECF No. 25).

Thereafter, Defendants filed the instant motion for summary judgment on the surviving claims from Plaintiff's first amended complaint. (ECF No. 58).

## III.   SUMMARY OF THE PARTIES' ARGUMENTS

Defendants argue that the undisputed evidence shows that Plaintiff's retaliation claim against Thompson "amounts to nothing more than a disagreement with a classification committee's legitimate decision to deny his request to transfer to the institution of [Plaintiff's] choice" and that Plaintiff's cruel-and-unusual-punishment claim fails because "Castellanos was not involved in any assault on [Plaintiff] on October 12, 2017." (ECF No. 58-2, pp. 1-2). Defendants also argue that they are entitled to qualified immunity because "they violated no constitutional rights" and they reasonably believed that their actions involving Plaintiff were lawful. (*Id.* at 13).

In support of their summary judgment motion, each Defendant has submitted a declaration signed under penalty of perjury. (ECF No. 58-4, pp. 36, 47). Thompson's declaration states that the decision to deny Plaintiff's transfer request was based on legitimate factors considered by a committee—such as Plaintiff's having received a RVR within the preceding year. (ECF No. 58-4, p. 35). Castellanos' declaration states that he did nothing to instigate the inmate attack on Plaintiff

1  and suggests that the circumstances of the attack indicate that the assault was motivated by the

2  attackers' gang affiliation. (*Id.* at p. 47).

3         Plaintiff's opposition asserts that, based on his understanding of the criteria for a transfer,

4  his transfer request should have been granted. (ECF No. 66). Specifically, he asserts that he "did

5  nothing but positively program his whole stay at HDSP" and that the decision to deny his transfer

6  request was in retaliation for having filed a grievance. (*Id.* at 4). And he argues that the retaliation

7  can be seen by Thompson's demeanor at the hearing, which he generally describes as "unpolite,

8  unethical, rude, [and] unfair," with Thompson stating that Plaintiff "was going nowhere." (*Id.* at

9  7).

10         As to Castellanos, Plaintiff asserts that he instigated the assault. (*Id.* at 4-6). In support,

11  Plaintiff states that Castellanos spoke to Calderon late at night before the incident. (*Id.* at 6).

12  Further, Castellanos told him that "retaliation was part of the game while being a prisoner trying

13  to litigate." (*Id.* at 5). (*Id.*). Additionally, he asserts that Calderon's statement, "you know what's

14  up Castellanos," leaves no doubt that Castellanos was involved in Plaintiff's assault.  (*Id.*).

15         Defendants' reply argues that Plaintiff has failed to submit evidence creating a genuine

16  issue of material fact and repeats their prior arguments for summary judgment. (ECF No. 67).

17  **IV.    LEGAL STANDARDS FOR SUMMARY JUDGMENT**

18         Summary judgment in favor of a party is appropriate when there "is no genuine dispute as

19  to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

20  56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine

21  dispute about material facts, summary judgment will not be granted."). A party asserting that a

22  fact cannot be disputed must support the assertion by "citing to particular parts of materials in the

23  record, including depositions, documents, electronically stored information, affidavits or

24  declarations, stipulations (including those made for purposes of the motion only), admissions,

25  interrogatory answers, or other materials, or showing that the materials cited do not establish the

26  absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

27  evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

28  *///*

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the Court must determine whether a fair-minded jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). And, "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255.

In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

**V.     CONSIDERATION OF FACTS SUBMITTED BY PLAINTIFF**

In their reply brief, Defendants ask that the Court disregard any factual assertions in Plaintiff's opposition because "Plaintiff's opposition fails to comply with Local Rule 260(b)." (*Id.* at 3). Under this Court's local rules, "[e]ach motion for summary judgment or summary

adjudication shall be accompanied by a 'Statement of Undisputed Facts' that shall enumerate discretely each of the specific material facts relied upon in support of the motion and cite the particular portions of any . . . document relied upon to establish that fact." Local Rule 260(a). Defendants also claim that any facts asserted in opposition should be disregarded because Plaintiff failed to submit a separate declaration signed under penalty of perjury.

A party opposing a motion for summary judgment is required to "reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed" and include "with each denial a citation to the particular portions of any . . . document relied upon in support of that denial" and is "responsible for the filing of all evidentiary documents cited in the opposing papers." Local Rule 260(b) "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). A Court may also disregard any unsworn statements in connection with summary judgment. *Soto v. Sweetman*, 882 F.3d 865, 873 (9th Cir. 2018) (noting that "unsworn district court responses to the defendants' motion for summary judgment" did not meet *Rand*'s requirements and was "not competent evidence" for purposes of summary judgment").

While Plaintiff did not strictly comply with Local Rule 260(b), his opposition brief included a section called "Summary of Disputed Facts," which specifically addressed the facts that Plaintiff deemed disputed as to each Defendant. (ECF No. 66, p. 2). Additionally, most of the facts relied on in Plaintiff's opposition were also included in Plaintiff's first amended complaint, which included the following verification: "I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct." (ECF No. 16, p. 20). "A verified complaint may be used as an opposing affidavit under Rule 56." *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995). While such a complaint "must be based on personal knowledge and set forth specific facts admissible in evidence" in order "to function as an opposing affidavit," *id.*, many relevant facts asserted in

1   opposition are based on Plaintiff's personal knowledge. Additionally, the Court is mindful that

2   "courts should construe liberally motion papers and pleadings filed by *pro se* inmates and should

3   avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th

4   Cir. 2010).

5          Thus, given Plaintiff's status as a *pro se* inmate, his verified complaint including many of

6   the facts relied on, and his detailed opposition including his "Summary of Disputed Facts," the

7   Court concludes that it may properly consider those facts in Plaintiff's opposition to the extent

8   that they also appear in Plaintiff's verified first amended complaint and reasonably appear to be

9   based on his personal knowledge. The Court addresses such facts in its analysis below.

10  **VI.   ANALYSIS**

11         **A.    Retaliation**

12         It is well-established that prisoners have a First Amendment right to file prison grievances

13  and that retaliation against prisoners for their exercise of this right is a constitutional violation.

14  *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009). "Within the prison context, a viable claim

15  of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took

16  some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and

17  that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action

18  did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559,

19  567–68 (9th Cir. 2005) (footnote and citations omitted). To prevail on a retaliation claim, a

20  plaintiff may "assert an injury no more tangible than a chilling effect on First Amendment rights."

21  *Brodheim*, 584 F.3d at 1269–70. Furthermore, "a plaintiff does not have to show that 'his speech

22  was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or

23  silence a person of ordinary firmness from future First Amendment activities.'" *Id.*at 1271 (citing

24  *Rhodes*, 408 F.3d at 568–69).

25         Circumstantial evidence, such as the timing of an alleged retaliatory act, can be considered

26  as evidence to support a retaliation claim. *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003)

27  (finding genuine issue of material fact on retaliation claim based, in part, on plaintiff "offer[ing]

28  the suspect timing of [a gang validation investigation] coming soon after his success in [] prison

conditions grievances" and that evidence used to validate him as a gang member had "previously [been] determined to be insufficient" to conclude that he was a gang member). Nevertheless, First Amendment retaliation is not established simply by showing adverse activity by a defendant after protected speech; rather, the plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on the "logical fallacy of *post hoc*, *ergo propter hoc*, literally, "after this, therefore because of this."). The plaintiff must allege specific facts demonstrating that the plaintiff's protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim*, 584 F.3d at 1271 (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir.1989)).

Considering the legal requirements for Plaintiff's retaliation claim, the Court now examines the arguments and facts from each party regarding the motion for summary judgment. Beginning with Thompson, he argues that he is entitled to summary judgment on Plaintiff's retaliation claim because the decision to deny Plaintiff's transfer request was based on legitimate factors and was not a retaliatory act due to Plaintiff having filed a grievance. (ECF No. 58-2). In support, Thompson primarily relies on his declaration, which states as follows.

Thompson was employed at HDSP as a correctional captain during the relevant events in the complaint. (ECF No. 58-4, pp. 31-32). As part of his duties, he served as chairperson of a unit classification committee (UCC), which determines "the proper placement of inmates in the appropriate housing, custody, and programs" and is generally composed of three people. (*Id.* at 32). "Inmates appear before a UCC at least annually to adjust the classification score and reevaluate the inmate's housing status and needs." (*Id.*).

Based on a UCC's review, an inmate will be assigned to a facility corresponding with a security level, with the placement score being informed by factors including "the inmate's age, commitment offense, affiliations with organized crime, and history of violent behavior." (*Id.* at 33). The higher the placement score, the higher the security level for the facility that the inmate is placed in:

> An inmate with a placement score of 0 through 18 is placed in a Level I facility.
> An inmate with a placement score of 19 through 35 is placed in a Level II facility.
> An inmate with a placement score of 36 through 59 is placed in a Level III facility.

An inmate with a placement score of 60 and above is placed in a Level IV facility. (*Id.*). While the placement score generally controls the facility designation, "[u]nder certain limited circumstances, classification staff may override an inmate's score-based designation for a particular security level," for example, one basis for overriding the score is an inmate's demonstration of "a remarkable pattern of good behavior." (*Id.*).

> Separate and apart from any formal override process, with respect to transfers between facilities at the same security level (e.g., Level IV-to-Level IV), classification staff may consider similar factors when evaluating a transfer request, such as an inmate's pattern of good behavior and/or positive programming, as well as demonstrably compelling hardships at the current institution. However, neither an inmate's family ties nor good behavior can be dispositive, given the competing factors that bear on housing determinations, such as bed availability and security considerations.

(*Id.* at 33-34). Thompson asserts that, in reviewing Plaintiff's classification and his transfer request, the UCC's decision was based on an evaluation of the above considerations, not on retaliation. (*Id.* at 34).

Specifically, Thompson notes that, on November 2, 2016, Plaintiff appeared for his annual review having a placement score of 71, which the committee lowered that day to 69 in Plaintiff's favor. (*Id.*). This meant that Plaintiff would ordinarily be sent to a level IV facility, like HDSP where he was already housed. (*Id.*). Plaintiff's placement score was informed, in part, by Plaintiff's underlying conviction for murder and Plaintiff's placement on the sensitive needs yard, which is made up of inmates who have encountered threats from the general prison population. (*Id.*).

Before or during the UCC hearing, Plaintiff requested to be transferred to a facility closer to his family in Orange County, California, citing his positive behavior as warranting transfer. (*Id.*). However, after considering all the factors at issue, the committee determined that a transfer was not appropriate for the following reasons: (1) Plaintiff failed to submit verification of any "information corroborating the hardship that he cited"; (2) Plaintiff had only moved to HDSP in March 2016, and the UCC felt that the eight-month period between his transfer and the annual review was insufficient to "adequately monitor [Plaintiff's asserted] programming and [good] behavior"; (3) there were no compelling reasons justifying a transfer, such as Plaintiff having a

1    medical condition warranting an immediate transfer; and (4) Plaintiff "had received a rules

2    violation report within the preceding year, for delaying a peace officer in the performance of his

3    duties." (*Id.* at 35). Thompson has provided a chrono from the UCC hearing that generally

4    reiterates these reasons. (*Id.* at 42).

5         Moreover, Thompson states that, "[w]hile classification committee members may consider

6    an inmate's preference and good behavior, they are not dispositive and do not entitle the inmate to

7    any particular transfer" because "[i]t would be untenable to grant all inmates' housing preferences

8    given the multitude of inmates housed in California prisons, with varying degrees of preferences

9    and security risks." (*Id.*). Lastly, Thompson states that none of Plaintiff's grievances or appeals

10   were mentioned during the hearing, nor did any such grievances or appeals affect his decision or

11   behavior during the hearing. (*Id.* at 36).

12        Citing this evidence as the basis to deny Plaintiff's transfer request, Thompson argues that

13   Plaintiff's claim "amounts to nothing more than a disagreement with the UCC's decision to deny

14   his request to transfer to another institution. However, [Plaintiff's] mere disagreement does not

15   establish that the decision to deny his transfer request was *because of* a pending appeal." (ECF

16   No. 58-2, p. 10 (emphasis in original and internal citations to record omitted)).

17        The Court now considers Plaintiff's argument and facts in his opposition to summary

18   judgment that reasonably appear to be based on his personal knowledge. (*See* ECF No. 66, pp. 2-

19   4 – section of opposition brief entitled "Disputed Facts Pertaining to [Thompson]"; *see also* ECF

20   No. 16, p. 5 – section of the verified first amended complaint providing facts related to this

21   claim). Plaintiff states that he "did nothing but positively program" while at HDSP, pointing out

22   that he participated in self-help groups and generally indicates that the decision to deny his

23   transfer request must have been because of the grievance that he filed. (ECF No. 66, p. 4).

24   Further, he states that at the hearing, Thompson did not want "to hear anything of what Plaintiff

25   had to say" and told him that when Plaintiff had fewer points he would be remaining at HDSP but

26   at a yard with a Level 3 security designation. (*Id.*).

27        Additionally, Plaintiff's opposition brief offers factual assertions that do not reasonably

28   appear to be based on his personal knowledge; rather, they appear based on his personal beliefs.

1    For example, Plaintiff states, "In any different event Plaintiff strongly believes that based on his

2    positive program he currently had at the time he would of easily been granted a transfer

3    somewhere else. (Fact 29)." (ECF No. 66, p. 3). And he states that inmates at Level IV facilities,

4    like HDSP, "are mostly individuals who[] keep getting in trouble and can't seem to stay

5    disciplinary free." (*Id.* at p. 2). Because these statements are speculative and not based on his

6    personal knowledge, the Court will not consider them.

7            However, considering the facts that are based on Plaintiff's personal knowledge, the Court

8    concludes "the record taken as a whole could not lead a rational trier of fact to find for

9    [Plaintiff]"; thus, there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v.*

10   *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Importantly, Thompson's declaration

11   acknowledges that good behavior, as Plaintiff asserts, can be considered in evaluating a transfer

12   request. (ECF No. 58-4, p. 34). However, after the UCC considered all the other relevant factors,

13   it concluded that a transfer was not warranted because other "factors strongly weighed against

14   granting [Plaintiff's] transfer request: Plaintiff showed no evidence of a hardship, he had not

15   served enough time at HDSP to evaluate his pattern of behavior, he had had a prior RVR within

16   the preceding year, and there were no other reasons, such as a medical need, to warrant a transfer.

17   (*Id.* at 35). Generally, these same reasons are also reflected in the chrono that Thompson attached

18   in support of his motion for summary judgment. (ECF No. 58-4, p. 42).

19           Plaintiff does not contest that he had received a RVR for delaying a peace officer. (ECF

20   No. 66, p. 3). Rather, he acknowledges the RVR.[3] Plaintiff's belief that his purportedly good

21   behavior warranted a transfer in spite of such other legitimate considerations is insufficient to

22   create a genuine dispute of material fact as to whether the transfer was motivated by retaliation of

23   Plaintiff's exercise of his First Amendment rights. *See Sandin v. Conner*, 515 U.S. 472, 482

24   _____

25   [3] The Court notes that Plaintiff appears to discount the legitimacy of this RVR, stating as follows: "At the
     time of the hearing, Plaintiff had received a rules violation report at a different prison 'just a few months
26   fresh of being on the mainlines for years' for said delaying a peace officer in the performance of his duties
     because Plaintiff was continuously being tested coming off general population and custody try to prove a
27   point we're on our own now. Custody wanted to move Plaintiff to a block where Plaintiff had heard was
     terrible, and all Plaintiff asked was to be moved to a different block. Plaintiff moved, and was given a
     rules violation report in the next few days, he was unaware of Defendants have access to those facts, as
28   that's exactly what happen." (ECF No. 66, p. 3).

1   (1995) (noting that "federal courts ought to afford appropriate deference and flexibility to state

2   officials trying to manage a volatile environment").

3        Likewise, the fact that the transfer followed the filing of Plaintiff's grievance is not

4   enough to create a genuine issue of material fact. "The mere existence of prior complaints against

5   prison staff does not prove that [p]laintiff was the subject of adverse action because of such prior

6   complaints. Retaliation is not established simply by showing adverse activity by defendant after

7   protected speech; rather, plaintiff must show a nexus between the two." *Calloway v. Kelley*, No.

8   1:11-CV-01090-LJO, 2015 WL 4722976, at *28 (E.D. Cal. Aug. 7, 2015), *subsequently aff'd sub*

9   *nom. Calloway v. Kelly*, 733 F. App'x 910 (9th Cir. 2018). Plaintiff fails to sufficiently connect

10  the transfer denial to his grievance.

11       Lastly, Thompson's allegedly impolite demeanor and statement that Plaintiff would

12  remain at HDSP when he had fewer points are insufficient, based on all the other evidence, for a

13  rational jury to conclude in Plaintiff's favor were this case to go to trial.

14       Accordingly, the Court recommends granting defendant Thompson's motion for summary

15  judgment on this claim.

16       **B.    Cruel and Unusual Punishment**

17       Inmates have an Eighth Amendment right to be free from "calculated harassment

18  unrelated to prison needs." *Hudson v. Palmer*, 468 U.S. 517, 530 (1984). "The [Eighth]

19  Amendment also imposes duties on [prison] officials," including the duty to protect prisoners

20  from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994).

21  "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay

22  for their offenses against society.'" *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347

23  (1981)). "When prison officials maliciously and sadistically use force to cause harm,

24  contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9. A person may

25  deprive another of a constitutional right, within the meaning of § 1983, "not only by some kind of

26  direct personal participation in the deprivation, but also by setting in motion a series of acts by

27  others which the actor knows or reasonably should know would cause others to inflict the

28  constitutional injury." *Hydrick v. Hunter*, 500 F.3d 978, 985 (9th Cir. 2007), *vacated and*

1    *remanded on other grounds*, 556 U.S. 1256 (2009) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-

2    44 (9th Cir. 1978)).

3          "It is not, however, every injury suffered by one prisoner at the hands of another that

4    translates into constitutional liability for prison officials responsible for the victim's safety."

5    *Farmer*, 511 U.S. at 834. Rather, two requirements must be met. First, there have to be

6    "conditions posing a substantial risk of serious harm" to the prisoner. *Id.* Second, prison officials

7    must have a state of mind of "'deliberate indifference' to inmate health or safety." *Id.* (citation

8    omitted); *see also Toscano v. Davey*, No. 1:16-cv-01369-DAD-SAB (PC), 2017 WL 11490695, at

9    *2-4 (E.D. Cal. Sept. 15, 2017) (applying two-part test from *Farmer* to plaintiff's claims that

10   prison officials had encouraged other inmates to harass and threaten the plaintiff and that certain

11   actions by a prison official were taken to set the plaintiff up "for assault/murder").

12         Considering the legal requirements for Plaintiff's cruel-and-unusual-punishment claim,

13   the Court now examines the arguments and facts submitted by each party regarding the motion

14   for summary judgment. Beginning with Castellanos, he argues that he is entitled to summary

15   judgment on Plaintiff's cruel-and-unusual-punishment claim because the undisputed evidence

16   shows that he did not direct the inmate assault on Plaintiff. (ECF No. 58-2, p. 11). In support,

17   Castellanos states as follows in his declaration.

18         Castellanos is employed as a correctional officer at CSATF where his duties include

19   supervising and protecting inmates. (ECF NO. 58-4, p. 45). Before October 12, 2017, Castellanos

20   recalls speaking with Plaintiff, who asked if he could move into the building where Castellanos

21   mainly provided coverage. (*Id.* at 46). He does not remember speaking to Plaintiff about any of

22   his ongoing litigation. (*Id.*).

23         On October 12, 2017, Castellanos heard an alarm sound. (*Id.*). He heard another officer

24   order all inmates down to the ground and observed Plaintiff and two other inmates, later

25   identified as Calderon and Perez, on the ground in a prone position. (*Id.*). It appeared that the

26   three inmates had "just ceased a physical altercation," although Castellanos "did not see the

27   altercation as it happened." (*Id.*). Another officer informed him that Calderon and Perez had

28   joined together to assault Plaintiff. (*Id.*).

Castellanos did not know why they assaulted Plaintiff, but after reviewing prison records and talking with staff, "it appears that the assault arose from intra-inmate disputes or relations, separate and apart from any involvement of a staff member." (*Id.* at 47). Castellanos "had no involvement whatsoever in the assault" and did not directly or indirectly direct the inmates to assault Plaintiff. (*Id.*). Castellanos was informed "that inmates Perez and Calderon yelled references to or about two-fivers (25ers) as they assaulted [Plaintiff]," which leads him "to believe that their assault was motivated by a prison-gang dispute or was compelled by their gang affiliation." (*Id.*). Citing this evidence, Castellanos asserts that he has "no knowledge why the two inmates assaulted [Plaintiff]." (ECF No. 58-2, p. 11).

The Court now considers Plaintiff's facts in his opposition to summary judgment that reasonably appear to be based on his personal knowledge. (*See* ECF No. 66, pp. 4-6 – section of opposition brief entitled "Facts Pertaining to Castellanos"; *see also* ECF No. 16, pp. 14-15 – section of the verified first amended complaint providing facts related to this claim). Before the attack, Plaintiff recalls speaking with Castellanos about unspecified "prison staff misconduct," with Castellanos responding that "retaliation was part of the game while being a prisoner trying to litigate." (*Id.* at 5). Castellanos engaged in "awkward late at night one on one conversations" with Calderon, one of the inmates who attacked Plaintiff, before the attack. (ECF No. 66, p. 6). And confirming in Plaintiff's mind that Castellanos orchestrated the attack is Calderon's statement, "You know what's up Castellanos," after Plaintiff asked, "You guys work for the f/n cops!?" (*Id.* at 6).[4]

After considering these facts and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that a genuine issue of a material fact remains for trial. If Defendant Castellanos stated that "retaliation was part of the game" for litigation activities to Plaintiff, that statement could be construed as a threat against Plaintiff. (ECF No. 66, p. 5). Similarly, before the attack,

---

[4] Plaintiff also relies on an additional allegation in his opposition brief: On the day of the attack, Castellanos was "lingering around past his shift change time for a few minutes" and Plaintiff asserts that Castellanos' office is close to where the assault occurred and questions whether Castellanos truly did not witness the attack as it occurred. (ECF No. 66, p. 5). However, because this allegation was not included in the verified complaint, the Court disregards it.

1    Plaintiff observed Castellanos speaking privately with Calderon, one of the inmates who attacked

2    Plaintiff, which could indicate that Castellanos was speaking with Calderon about assaulting

3    Plaintiff. (*Id.* at 6). Finally, after the assault occurred, Plaintiff asked the inmates who assaulted

4    him whether they worked for the "cops," to which Calderon responded, "You know what's up

5    Castellanos!" (*Id.*). If one of the attackers used Castellanos' name in response to Plaintiff's

6    question about that attack, that would be evidence a reasonable jury could consider in finding that

7    Castellanos directed the attack.

8           Thus, the Court recommends denying summary judgment as to Plaintiff's cruel-and-

9    unusual-punishment claim against Castellanos.

10   **VI.    QUALIFIED IMMUNITY**

11          The Court next considers Castellanos' argument that he is entitled to qualified immunity

12   because he did not violate Plaintiff's constitutional rights and "[n]o reasonable person in

13   Castellanos' position would construe his response to an alarm and actions thereafter as amounting

14   to cruel and unusual punishment."[5] (ECF No. 58-2, pp. 12-13).

15          Government officials enjoy qualified immunity from civil damages unless their conduct

16   violates "clearly established statutory or constitutional rights of which a reasonable person would

17   have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457

18   U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold

19   public officials accountable when they exercise power irresponsibly and the need to shield

20   officials from harassment, distraction, and liability when they perform their duties reasonably."

21   *Pearson*, 555 U.S. at 231.

22          In determining whether an officer is entitled to qualified immunity, the Court must decide

23   (1) whether facts alleged or shown by plaintiff make out a violation of constitutional right; and

24   (2) whether that right was clearly established at the time of the officer's alleged misconduct.

25   *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts are

26   "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

27   _____

[5] Because the Court has recommended granting summary judgment as to Thompson, it does not address
28   his argument for qualified immunity.

immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. In resolving these issues, the Court must view the evidence in the light most favorable to the plaintiff and resolve all material factual disputes in favor of the plaintiff. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

As set forth above, the Court has found that the evidence, taken in the light most favorable to Plaintiff, presents genuine issues of material fact regarding whether Castellanos violated Plaintiff's right to be free from cruel and unusual punishment. In arguing his entitlement to qualified immunity, however, Defendant frames the facts in a light most favorable to him, stating that no person in his "position would construe his response to an alarm and actions thereafter as amounting to cruel and unusual punishment." (ECF No. 58-2, p. 13). However, the proper inquiry considers the facts in a light most favorable to Plaintiff—whether a reasonable person in Castellanos' position would have known in 2017 that orchestrating an attack on an inmate would violate Plaintiff's constitutional rights to be free from cruel and unusual punishment.

On this question, the law was clear by 2017. In 1994, the Supreme Court noted in *Farmer* that the Eighth Amendment requires prison officials to protect prisoners from violence by other prisoners. 511 U.S. at 833. Surely, if someone in Castellanos' position direct an attack against Plaintiff, he would realize that his conduct was unlawful. *See Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) (relying on *Farmer* to conclude that "the shield that qualified immunity provides is limited to those officials who are either unaware of the risk or who take reasonable measures to counter it" and that "where guards themselves are responsible for the rape and sexual abuse of inmates, qualified immunity offers *no* shield") (emphasis in original); *Felix v. McCarthy*, 939 F.2d 699, 702 (9th Cir. 1991) (denying qualified immunity in case involving "unprovoked and unjustified attack [on an inmate] by [] prison guard[s]").

Based on the foregoing, the Court recommends denying summary judgment on the basis of qualified immunity.

## VII.   PLAINTIFF'S REQUEST TO SEND LETTER

Attached to Plaintiff's opposition brief is a letter written to Calderon, one of the inmates who assaulted him, and a letter to the Court. The letter to Calderon asks Calderon to "tell . . . the

1   truth" about whether "Castellanos asked [him] to fight [Plaintiff]." (ECF No. 66, p. 49). The letter

2   directed to the Court asks whether it is possible to forward the Calderon letter to Calderon.  (*Id.* at

3   56). Plaintiff offers no address for Calderon, whom he indicates has been released from prison.

4   (*Id.* at 50). Because "[a] request for a court order must be made by motion," under Federal Rule

5   of Civil Procedure 7(b)(1), the Court construes Plaintiff's request as a motion for the Court to

6   forward the letter to Calderon.

7           The Court will deny the construed motion. Plaintiff has provided no address for Calderon,

8   and, even if he had, it would be Plaintiff's responsibility to mail the letter to him directly as

9   opposed to asking the Court to forward the letter to him.  It is not the Court's role to investigate

10   where someone lives and ensure that mail is delivered to that person. *See Baker v. Solano County*,

11   No. 2:10-CV-1811 KJN P, 2011 WL 2144416, at *3 (E.D. Cal. May 31, 2011) (noting the court

12   did "not intend to serve as the conduit for plaintiff's discovery responses when or if there is a

13   quarrel about receipt of responses").  Additionally, the non-expert discovery deadline expired on

14   February 19, 2021, so to the extent Plaintiff is asking the Court to conduct discovery at this time,

15   it is denied. (*See* ECF No. 56).

16   **VIII.   CONCLUSION AND RECOMMENDATION**

17           Accordingly, as discussed above, IT IS ORDERED that Plaintiff's motion to forward a

18   letter (ECF No. 66) is denied.

19           Additionally, based on the forgoing, IT IS RECOMMENDED that:

20           1.      The motion for summary judgment (ECF No. 58) by Defendants T. Thompson and

21   J. Castellanos be granted as to the retaliation claim against Defendant Thompson and

22   denied as to the cruel-and-unusual-punishment claim against Defendant Castellanos;[6] and

23           2.      The case proceed against Defendant Castellanos.

24   _____

25   6 Federal Rule of Civil Procedure 54(b) provides that "[w]hen an action presents more than one claim for
relief  . . .or multiple parties are involved, the court may direct entry of a final judgment as to one or more,
but fewer than all, claims or parties only if the court determines that there is no just reason for delay." This

26   determination "left to the sound judicial discretion of the district court" but such discretion should be
exercised "in the interest of sound judicial administration" and in light of the "historic federal policy

27   against piecemeal appeals." *Id.* In determining whether to direct entry of a final judgment as to fewer than
all parties, courts should consider "whether the certified order is sufficiently divisible from the other

28   claims such that the case would not inevitably come back to this court on the same set of facts." *Jewel v.*

1

2

3

4

5

6

7

8

9

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

10

IT IS SO ORDERED.

11

12

    Dated:   **August 30, 2021**        /s/ *Erica P. Grosjean*

                                          UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

*Nat'l Sec. Agency*, 810 F.3d 622, 628 (9th Cir. 2015) (internal citations omitted). Here, Defendants do not request entry of a separate final judgment. Additionally, the claims that remain are based on the same set of facts as those for which summary judgment is granted. A final judgment would not be divisible from the other claims in the case, would lead to piecemeal judgments, and any appeal of a later judgment would involve the same set of facts. Therefore, the Court does not recommend entry of a separate final judgment at this time.